IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

          Plaintiff,

   v.

STEPHANIE WINSTON WOLKOFF,

          c/o Lorin L. Reisner
          Paul, Weiss, Rifkind, Wharton
             & Garrison LLP
          1285 Avenue of the Americas
          New York, NY 10019

          Defendant.

Civil Case No. 20-2935

**COMPLAINT**

The United States alleges as follows:

## INTRODUCTION

1.   The United States of America brings this civil action for breach of contract and breach of fiduciary obligations against Defendant Stephanie Winston Wolkoff, who has published a book about the First Lady of the United States ("First Lady," FLOTUS, or Mrs. Trump) in flat violation of Ms. Wolkoff's contractual obligations and fiduciary duties.

2.   In 2017, Ms. Wolkoff volunteered to serve as an advisor to the First Lady in the East Wing, where she would assist the First Lady on policy initiatives, speeches, and other matters, without monetary compensation, *see* Gratuitous Services Agreement § I (attached as Exhibit A) ("Agreement" or "GSA").  In August 2017, the parties memorialized their agreement in a GSA wherein Ms. Wolkoff promised to maintain strict confidentiality over "nonpublic, privileged and/or confidential information" that she might obtain during her service under the Agreement. *Id.* § V.

3.   Ms. Wolkoff agreed, among other things, "that [she was] specifically prohibited from publishing, reproducing or otherwise divulging any such information to any unauthorized person or entity in whole or in part." *Id.*  She also promised not to disclose her "work with FLOTUS and [the Office of the First Lady] . . . to any person or entity to whom disclosure has not been authorized in writing by FLOTUS, the Chief of Staff to the First Lady or the Office of the White House Counsel," and to refrain from "us[ing] or referenc[ing] [her] gratuitous services in connection with any merchandising or other commercial activity."  *Id.* §§ VII, XI.  Further, Ms. Wolkoff affirmatively committed to "take all reasonable measures to protect" the nonpublic, privileged and/or confidential information that she might receive "from unauthorized disclosure."  *Id.* § V.

The Agreement specifically bound Ms. Wolkoff to direct any questions concerning disclosure of such information to the Office of White House Counsel.  *Id.*

4.    In violation of these binding commitments, Ms. Wolkoff has written a book that Simon & Schuster promotes as a "scathing tell-all" and an "epic scream of a tell-all." https://www.simonandschuster.com/books/Melania-and-Me/Stephanie-Winston-Wolkoff/ 9781982151249 (last visited Oct. 13, 2020) (quoting reviews from People.com and the *New York Times Book Review*, respectively, in the "Raves and Reviews" section).  Ms. Wolkoff titled the book *Melania and Me: The Rise and Fall of My Friendship with the First Lady* ("*Melania and Me*").  The book was released on September 1, 2020, by Simon & Schuster under its Gallery Books imprint.

5.    In contrast to the definition of the limited time period during which Ms. Wolkoff promised to provide advice and guidance to the First Lady, the Agreement included no termination date for Ms. Wolkoff's nondisclosure obligations.  *Compare* GSA § I (promising assistance from the date of execution of the Agreement through September 30, 2018), *with, e.g.*, *id.* § V (acknowledging that "while this information is in my possession, I shall take all reasonable measures to protect it from unauthorized disclosure and to restrict access to those who have a bona fide requirement for such access"), *id.* § VI (promising affirmative measures to protect confidentiality without respect to any termination date), and *id.* § VII (prohibiting disclosure without respect to any specific timeframe).

6.    Ms. Wolkoff never submitted a draft of the book to the First Lady, her Chief of Staff, or the Office of White House Counsel and never received authorization to disclose any information she learned pursuant to her work under the Agreement.  The book, however, discusses in detail Ms. Wolkoff's work under the Agreement as an advisor to the First Lady, including involvement

in personnel decisions in the Office of the First Lady, work on the First Lady's "Be Best" initiative, and engagement in conversations with the President of the United States. These topics fall squarely within the category of materials that, under the terms of the Agreement, Ms. Wolkoff expressly agreed not to divulge without obtaining written authorization.

7.   The United States seeks to hold Ms. Wolkoff to her contractual and fiduciary obligations and to ensure that she is not unjustly enriched by her breach of the duties she freely assumed when she served as an advisor to the First Lady. Ms. Wolkoff's service facilitated her access to significant confidential information related to the First Lady's official duties as well as to the more private aspects of her role in the First Family, along with indirect access to deliberative information, to which the First Lady was privy, related to the President's official duties on behalf of the country. The United States accordingly seeks an order establishing a constructive trust on any profits obtained by Defendant from the disclosure of information in, or dissemination of, *Melania and Me*.

## JURISDICTION AND VENUE

8.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 1345. Federal common law governs the GSA and the constructive trust sought. *See United States ex rel. SBA v. Pena*, 731 F.2d 8, 11 (D.C. Cir. 1984) ("Jurisdiction for the SBA's action against the loan guarantors rested on 28 U.S.C. § 1345 (1976), which applies to suits in which the United States is a plaintiff; when the United States sues, federal interests are sufficiently implicated that federal law, including federal common law, may be invoked to define the rights and liabilities of the parties.").

9.   The federal rule of decision here is appropriately one with uniform national content given the national nature of the interests and operations related to FLOTUS, which are protected

by the GSA.  In the alternative, the local law of the District of Columbia (the analogue to a State's law) can be borrowed to provide the rule of decision.

10. Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(b) because the District of Columbia is the judicial district in which the White House is located and in which the contractual relationship for providing services was centered—with said contract being memorialized on "The White House—Washington" stationery.

## PARTIES

11. Plaintiff is the United States of America (hereafter "United States" or "Government").

12. On information and belief, Ms. Wolkoff, the Defendant, is a United States citizen and resident of New York.  She served as an advisor to the First Lady from 2017 to 2018.

## STATEMENT OF FACTS

### I.    The Role of the First Lady

13. The spouse of the individual holding the Office of the President of the United States has historically filled the role of First Lady of the United States.

14. As a member of the President's immediate family, the First Lady is entitled by statute to the protection of the Secret Service.  18 U.S.C. § 3056(a)(2).  Like other individuals entitled to this protection, such as Vice Presidents and their immediate families, visiting heads of state, major presidential candidates, and official representatives of the U.S. performing missions abroad when the President directs the provision of protection, First Ladies receive Secret Service protection because the securing of a First Lady's safety and security helps to facilitate the President's ability to carry out his role as chief executive and chief diplomat on behalf of U.S. interests, unencumbered by concerns for the safety of his family either during or after his presidential service.

15. The First Lady has historically played an important role in assisting the President with discharging his official duties and responsibilities.  Although the duties of First Ladies have varied over time, they have typically involved assisting the President with hosting foreign dignitary visits to the White House, planning official events, pursuing initiatives to address domestic issues of public concern, giving speeches, and serving as one of the closest confidantes of the President. The First Lady also assists with planning and hosting White House events that support the President in his role as head of state.  Indeed, since Martha Washington, First Ladies have "hosted domestic and foreign visitors and [taken] part in ceremonial occasions."  Megan M. McLaughlin, *The Unofficial Federal Officer*, 46 HASTINGS CONST. L.Q. 17, 19 (2018).  In recent years, Mrs. Trump has planned President Trump's state dinners for the Prime Minister of Australia and the President of France.

16.   First Ladies have also supervised renovations and improvements to the White House and its surrounding grounds, all of which is federal property maintained by the National Park Service.  In addition, First Ladies serve as an informal ambassador for the residence to the public.

17. Although the First Lady does not draw a salary for performing any of these functions, Congress has authorized "assistance and services . . . to be provided to the spouse of the President in connection with assistance provided by such spouse to the President in the discharge of the President's duties and responsibilities," 3 U.S.C. § 105(e), indicating the official and significant nature of the functions performed by the First Lady as a support mechanism for the President as he carries out his chief executive responsibilities.

18. In order for the First Lady to fulfill the traditional public role she serves on behalf of the President and the Government, and the essential role that she plays in supporting and facilitating the President's role as head of state and principal officer over the executive branch, it

is critical that the First Lady be able to obtain assistance from individuals in support of her work. And it is particularly important that she be able to do so without fear that those providing assistance to her and to other members of the First Family—and, indirectly through them, to the President— will divulge information provided in confidence that, if divulged, could undermine those critical presidential functions. The traditional role of the First Lady in connection with the President and the Government would be impaired if a confidential advisor could wholly ignore her nondisclosure obligations, voluntarily undertaken.

## II.      Defendant Wolkoff's Relationship with the First Lady

19. Following President Trump's election on November 8, 2016, Mrs. Trump began planning her transition to the White House. In January 2017, Ms. Wolkoff volunteered to assist Mrs. Trump as an advisor. Between January 2017 and August 21, 2017, Ms. Wolkoff served as an advisor to the First Lady. She assisted the First Lady in making personnel decisions for the First Lady's staff, helped to supervise remodeling of spaces in the East Wing of the White House for the First Lady and the Office of the First Lady, and communicated with the press on behalf of the First Lady.

20. On August 21, 2017, Ms. Wolkoff entered into a "Gratuitous Services Agreement" with the Government, formally memorializing the terms of her service to the First Lady. The Agreement was approved by a government contracting officer on August 22, 2017. Under the Agreement, Ms. Wolkoff agreed to serve in a "volunteer role as a trusted advisor to Mrs. Melania Trump, the First Lady of the United States (FLOTUS)." Agreement at 1. In her capacity as an "advisor," Ms. Wolkoff agreed to "provid[e] advice and guidance on initiatives for FLOTUS as set forth" within the Agreement. *Id.* For example, the First Lady would rely on Ms. Wolkoff to

provide "advice with regard to policy initiatives, speeches to be given by FLOTUS and FLOTUS'[s] social media presence." *Id.* § I.

21. Some of the terms of the Agreement are limited to the period "[b]etween the execution of this Agreement and September 30, 2018," such as Section I concerning the actual terms of Ms. Wolkoff's service with respect to issues such as compensation and employment status. *Id.* Other provisions of the Agreement are not so limited. *See, e.g.*, *id.* § VII ("I shall not disclose the contents of this Agreement, *or my work with FLOTUS and OFL* [Office of the First Lady], to any person or entity to whom disclosure has not been authorized in writing by FLOTUS, the Chief of Staff to the First Lady or the Office of White House Counsel.") (emphasis added).

22. Ms. Wolkoff expressly "recognize[d] the importance and sensitivity" of her role and therefore "acknowledge[d] and agree[d]" to various obligations as a condition of taking on this role. *Id.* at 1.

23.  In particular, the Agreement makes clear that, by virtue of being placed in a position of trust as an advisor, Ms. Wolkoff "may have access to nonpublic, privileged and/or confidential information" while serving the First Lady. *Id.* § V.  Because of the trust placed in Ms. Wolkoff by the First Lady, and in consideration for access to the White House and sensitive information, *id.* §§ X, XIII, Ms. Wolkoff agreed to maintain strict confidentiality regarding this information.

24. The GSA was supported by adequate consideration, including because (but not limited to the fact that) Ms. Wolkoff was "allowed access to The White House complex and equipment in connection with this Agreement." *Id.* § X.  Few individuals are permitted such access and for someone in Ms. Wolkoff's position (a former director of special events at *Vogue* and producer of Met Galas), the ability to see firsthand the protocols and operations of the White House was a tremendous personal and professional opportunity of great value.

7

25. Ms. Wolkoff agreed, among other things, to "protect from inadvertent or intentional release or unauthorized disclosure any and all information furnished to [her] by the Government under this Agreement, information about the First Family, or other information about which [she might] become aware during the course of performance." *Id.* § V.  She also agreed that, "while this information is in [her] possession, [she would] take all reasonable measures to protect it from unauthorized disclosure."  *Id.*  She further acknowledged that she was "specifically prohibited from publishing, reproducing, or otherwise divulging any such information to any unauthorized person or entity in whole or in part."  *Id.*

26. The Agreement repeatedly makes clear that Ms. Wolkoff was required to obtain permission from the Government before disclosing information covered by the Agreement.

27. For example, Ms. Wolkoff agreed not to "disclose the contents of th[e] Agreement, or [her] work with FLOTUS and OFL [the Office of the First Lady], to any person or entity to whom disclosure ha[d] not been authorized in writing by FLOTUS, the Chief of Staff to the First Lady or the Office of the White House Counsel."  *Id.* § VII.

28. Ms. Wolkoff further acknowledged through signing the Agreement that "[a]ll materials, documents, data, or information conveyed to [her] in the course of performing gratuitous services [were] Government property," and that she would "not duplicate, remove from The White House complex, or take any such materials or information without duly authorized written permission of the Chief of Staff to the First Lady or the Office of the White House Counsel."  *Id.* § VIII.

29. Ms. Wolkoff also agreed that she would not "use or reference [her] gratuitous services in connection with any merchandising or other commercial activity," and that she would "not issue or publish any publicity materials or statements, including those made through the press or social

media, about [her] gratuitous services to FLOTUS without express authorization from [the Office of the First Lady]." *Id.* § XI.  She also committed to "clear all materials and statements with the First Lady's Chief of Staff and FLOTUS prior to public dissemination."  *Id.*

30. Finally, Ms. Wolkoff "acknowledged that [she was] specifically prohibited from publishing, reproducing or otherwise divulging any" information covered by the Agreement "to any unauthorized person or entity in whole or in part."  *Id.* § V.

31. Ms. Wolkoff has indicated that her obligation to perform services for the First Lady under the Agreement ended on February 20, 2018.  *See Melania and Me* at 304-05.

**III.    Ms. Wolkoff's Book**

32. On July 15, 2020, the Department of Justice directly notified counsel for Ms. Wolkoff that, based on media reports, it appeared that publication of *Melania and Me* would violate the terms of Ms. Wolkoff's Agreement with the Government.  *See* Exhibit B.

33.  On July 17, 2020, Ms. Wolkoff, through counsel, notified the Department of Justice that she believed there was no basis for the government's concerns and implied that she intended to continue with publication, notwithstanding the express promises she had made to safeguard all sensitive, confidential, and privileged information shared with her during her service in the White House.

34. On September 1, 2020, Simon & Schuster released *Melania and Me* to the public.  Ms. Wolkoff's memoir purports to "take[] the reader into . . . *the White House*."  *Id.* (on dust jacket, inside left flap) (emphasis added).  The book is 352 pages in length.

35. At no point did Ms. Wolkoff seek, nor has she received, permission from the First Lady, the Office of the First Lady, the Chief of Staff to the First Lady, the Office of White House

Counsel, or any other office or official within the Executive Office of the President to publish *Melania and Me.*

36. The substance of the book demonstrates that Ms. Wolkoff clearly understood the importance of the confidentiality commitment she had made in the GSA. *See Melania and Me* at 275 ("If I hadn't been prohibited by my nondisclosure agreement . . . ."). Ms. Wolkoff, for instance, recounts that she had reminded others who were providing services to the First Lady about their confidentiality obligations. *See id.* at 174 ("Nonetheless, I sent a letter to each of them. 'On behalf of the First Lady's Office, we wish to inform you that all services rendered are private and confidential,' it said. 'The Office of the First Lady kindly asks for your respect in maintaining complete privacy and not divulging any information about her, the First Family or the work you have performed. Any press requests must be formally submitted to and approved by the Office of the First Lady.'").

37. *Melania and Me* contains a detailed accounting of Ms. Wolkoff's work with the First Lady, including non-public, privileged, or confidential information that Ms. Wolkoff obtained during the course of performing the role specified in the Agreement.

38. For example, Ms. Wolkoff provides details about the contents of the Agreement itself. Ms. Wolkoff posits that the "finer points" of the Agreement were as follows: "(1) I would *volunteer* as a trusted advisor, (2) my duties were limited to providing advice and guidance on policy initiatives, speeches, and social media, as expressly requested by FLOTUS, (3) I was forbidden from interacting with third parties (journalists, etc.) unless explicitly authorized by the Office of the First Lady and only as a 'trusted advisor' or 'longtime friend,' not as a member of Melania's office, the White House, or the US government, (4) I'd submit to being investigated

by the FBI, and (5) the agreement could be discontinued at any time or for any reason by myself or at the sole discretion of FLOTUS." *Id.* at 254-55.

39. Ms. Wolkoff also describes her view of certain circumstances involving the President's Travel Ban, including her view (based on inferences that she derived from information received during the course of her confidential position) that, had the First Lady been present at the White House during a particular period in time leading up the issuance of the ban, the President might not have signed Executive Order 13,769. *See Melania and Me* at 175.

40. Ms. Wolkoff also purports to describe conversations, involving the President, on other policy matters.  For example, Ms. Wolkoff claims that she discussed with the First Lady the President's decision to eliminate a ban on the importation of big game trophies and that the First Lady convinced the President to put that decision on hold.  *Id.* at 269-70.   Such accounts purporting to disclose internal policy deliberations undermine the expectation of future Presidents and First Ladies that their confidential deliberations will be protected and preserved from the public glare.   The President's policy conversations are self-evidently core matters on which the President is entitled to receive confidential advice without fear that such internal deliberations will be leaked to the press.

41. Ms. Wolkoff also purports to reproduce verbatim portions or the entirety of numerous emails and text messages exchanged between herself and the First Lady and between herself and various other White House staff members during the time period of and as part of her work under the Agreement, including emails with Deputy White House Counsel Stefan Passantino.  *E.g.*, *id.* at 300.  These acts are contrary to the Agreement.  *See* GSA § XIII ("In consideration of being allowed access to The White House communications *and email systems* under this Agreement, I shall be responsible for properly protecting all information used, gathered, or developed on these

systems as the result of this Agreement.  I shall implement procedures that ensure that appropriate administrative, technical, and physical safeguards are established to ensure the security and confidentiality of all sensitive information and data.") (emphasis added).

42. Ms. Wolkoff also reveals deliberations about White House hiring decisions and her role in those decisions. *See Melania & Me* at 177-80.  The President needs to be able to trust his advisors and have confidential information about them kept confidential.  The President, the First Lady, and other advisors need to be able to freely deliberate about important decisions bearing on how the Executive Branch is constituted and operated.

43. The book also describes deliberations that Ms. Wolkoff had with the First Lady and other White House staff members regarding the First Lady's "Be Best" initiative, including how Ms. Wolkoff identified experts ("professors and leaders in the field of social and emotion learning"), proposed "a hundred names" for the initiative, prepared a presentation (with specific feedback she received from the First Lady on a draft), and presented that material internally to other staff.  *See, e.g.*, *id.* at 256, 258, 289-90, 293.  It also reproduces a memorandum that appears to include legal advice on how the experts should be treated (noting that they "will not, however, be making policy recommendations to the First Lady or the president in the form of a 'council,' an 'advisory committee,' a 'commission,' or through 'subcommittees'").  *Id.* at 276.

44. Ms. Wolkoff also describes other deliberations that she had with the First Lady and other White House staff members in her general role as an advisor, including when discussing what the First Lady should post on social media as well as providing help in writing a speech for the First Lady.  *E.g.*, *id.* at 256, 261.  Indeed, despite acknowledging the First Lady's desire to maintain privacy for her family, *see id.* at 316, Ms. Wolkoff relates particular information that the First Lady had expressly directed her to keep confidential, *see id.* at 226-27.

## CAUSES OF ACTION

### Count One: Breach of Contract; Unjust Enrichment;
### Constructive Trust

45. All preceding paragraphs are incorporated by reference, as if fully set forth herein.

46. Ms. Wolkoff voluntarily, willingly, and knowingly entered into a contractual agreement with the United States of America, allowing her access to the White House and sensitive information in consideration for agreeing to certain conditions on her use and dissemination of that information.

47. Ms. Wolkoff breached the GSA by disclosing her manuscript to Simon & Schuster, and causing it to be published, without having received written authorization from the Chief of Staff to the First Lady or the Office of White House Counsel.

48. The confidentiality obligations on Ms. Wolkoff survive the discontinuation or severance of the GSA.  Ms. Wolkoff agreed, among other things, to "protect from inadvertent or intentional release or unauthorized disclosure any and all information furnished to [her] by the Government under this Agreement, information about the First Family, or other information about which [she might] become aware during the course of performance."  *Id.* § V.  She expressly agreed to protect all such information for as long as she might have it: "[W]hile this information is in my possession, I will take all reasonable measures to protect it from unauthorized disclosure." *Id.  See also* Agreement §§ VII, VIII, XI.

49. No remedy at law could adequately compensate for Ms. Wolkoff's breach of her contractual duties and her failure to submit the book for prior written approval by the White House.

50. Defendant Wolkoff has been, and will continue in the future to be, unjustly enriched in the amount of profits, advances, royalties, and other advantages resulting from publicity given to the unauthorized disclosures contained in her book.

**Count Two: Breach of Fiduciary Duty; Unjust Enrichment;
Constructive Trust**

51. All preceding paragraphs are incorporated by reference, as if fully set forth herein.

52. Ms. Wolkoff's position as an advisor to the First Lady constituted a position of trust and confidence that established a fiduciary duty under common law to protect confidential information that she received as part of her duties.

53.  Under the common law, and in equity, Ms. Wolkoff had a fiduciary relationship with the United States of America based on her position of trust and confidence.  Defendant served as an advisor on many aspects of the First Lady's work for more than a year.  She participated in confidential deliberations on sensitive topics, including on issues as varied as personnel decisions concerning the First Lady's staff, the First Lady's official initiatives, and communications with the media.

54. Ms. Wolkoff owes to the United States a fiduciary duty to protect confidential information in her possession that she obtained through her service as an advisor to the First Lady.

55. As discussed above, Ms. Wolkoff agreed to keep certain information confidential.  *See* Agreement §§ V, VII, VIII, XI.

56. Ms. Wolkoff, however, breached those confidentiality obligations by disclosing confidential information in the *Melania and Me* manuscript to her publisher and causing the manuscript to be published.

57. Ms. Wolkoff agreed that "[a]ll materials, documents, data, or information conveyed to [her] in the course of performing gratuitous services are Government property.  I will not duplicate, remove from The White House complex, or take any such materials or such information without duly authorized written permission of the Chief of Staff to the First Lady or the Office of the White

House Counsel.  I acknowledge that any unauthorized duplication, removal, or other appropriation of materials or information may subject to me to criminal liability."  Agreement § VIII.

58. Defendant Wolkoff has been, and will continue in the future to be, unjustly enriched in the amount of profits, advances, royalties, and other advantages she receives as a result of her breach of her fiduciary obligations, including any misappropriation of Government data or information.

**PRAYER FOR RELIEF**

The United States asks for the following relief:

A.  Declare that Defendant Wolkoff has breached her contractual obligations by failing to submit *Melania and Me: The Rise and Fall of My Friendship with the First Lady* to the Government for advance written authorization;

B.  Declare that Defendant Wolkoff has breached her fiduciary obligations by publishing confidential Government information without written authorization from the United States;

C.  Impose a constructive trust for the benefit of the United States over, and require an accounting of, all monies, gains, profits, royalties, and other advantages that Defendant and her agents, assignees, or others acting on her behalf have derived, or will derive, from the publication, sale, serialization, or reproduction in any form including any movie rights, rights to adapt the book in any form including documentaries, or other reproduction rights, of *Melania and Me: The Rise and Fall of My Friendship with the First Lady*;

D.  Grant to the United States such other relief as the Court may deem just and proper, including the Government's attorneys' fees and costs.

Dated:  October 13, 2020                    Respectfully submitted,

                                            JEFFREY BOSSERT CLARK
                                            Acting Assistant Attorney General

                                            JOHN V. COGHLAN
                                            Deputy Assistant Attorney General

                                            ALEXANDER K. HAAS
                                            Director
                                            Federal Programs Branch


                                            */s/   Jeffrey A. Hall*
                                            JEFFREY A. HALL
                                            ELLIOTT M. DAVIS
                                            Attorneys
                                            United States Department of Justice
                                            Civil Division
                                            950 Pennsylvania Ave. NW, Room 3614
                                            Washington, D.C. 20530
                                            Tel: (202) 353-8679
                                            Fax: (202) 616-8460
                                            E-mail: jeffrey.a.hall@usdoj.gov

                                            *Counsel for Plaintiff*