## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-2935-CKK |
| | ) | |
| STEPHANIE WINSTON WOLKOFF, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S
### MOTION TO DISMISS THE COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.    The First Family's Interest in Confidentiality ................................................. 2

    II.   Ms. Wolkoff Agrees to Serve the First Lady In An Advisory Role ......................... 5

    III.  Ms. Wolkoff's Conduct After Leaving the White House ........................................ 7

LEGAL STANDARD ......................................................................................................... 8

ARGUMENT ...................................................................................................................... 8

    I.    The Confidentiality Provisions in the Agreement Survived Its Termination ........... 8

    II.   The Agreement Is Not Void for Lack of Consideration ......................................... 11

    III.  The Agreement Does Not Violate Ms. Wolkoff's Free Speech Rights ................... 13

## Table of Authorities

### Cases

*1010 Potomac Assocs. v. Grocery Mfrs. Of Am., Inc.*,
    485 A.2d 199, 205 (D.C. 1984) ........................................................................................ 9

*All W. Pet Supply Co. v. Hill's Pet Prods. Div., Colgate-Palmolive Co.*,
    840 F. Supp. 1433 (D. Kan. 1993) ................................................................................... 9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................................................... 8

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
    997 F.2d 898 (D.C. Cir. 1993) .................................................................................. 3, 15

*Clinton v. Jones*,
    520 U.S. 681 (1997) ......................................................................................................... 2

*Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*,
    793 F. Supp. 2d 311 (D.D.C. 2011) ............................................................................... 12

*Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*,
    31 F. Supp. 3d 237 (D.D.C. 2014) ................................................................................. 12

*Florida Keys Aqueduct Auth. v. United States*,
    7 Cl. Ct. 297, 299 (1985), *aff'd*, 790 F.2d 95 (Fed. Cir. 1986) (table) ......................... 12

*Franklin v. Capitol Hilton Hotel*,
    325 F. Supp. 3d 25 (D.D.C. 2018) ................................................................................... 8

*Free Enterprise Fund v. PCAOB*,
    561 U.S. 477–97 (2010) ................................................................................................... 2

*Haddon v. Exec. Residence at White House*,
    313 F.3d 1352–61 (Fed. Cir. 2002) ................................................................................. 4

*Hall v. Clinton*,
    285 F.3d 75 (D.C. Cir. 2002) ...........................................................................................3

*Howard Town Ctr. Dev., L.L.C. v. Howard Univ.*,
    7 F. Supp. 3d 64 (D.D.C. 2013) ...................................................................................... 9

*HPI/GSA 3C, L.L.C. v. Perry*,
    364 F.3d 1327 (Fed. Cir. 2004) ..................................................................................... 10

*Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*,
    876 F.3d 346 (D.C. Cir. 2017) ......................................................................................... 4

*Judicial Watch, Inc. v. U.S. Secret Service*,
    726 F.3d 208 (D.C. Cir. 2013) ......................................................................................... 2

*Lake James Cmty. Volunteer Fire Dep't, Inc. v. Burke County*,
    149 F.3d 277 (4th Cir. 1998) ............................................... 13

*McGehee v. Casey*,
    718 F.2d 1137 (D.C. Cir. 1983) ........................................... 14

*Milwaukee Deputy Sheriff's Ass'n v. Clarke*,
    574 F.3d 370 (7th Cir. 2009) ............................................... 14

*NRM Corp. v. Hercules, Inc.*,
    758 F.2d 676 (D.C. Cir. 1985) ............................................. 8

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ............................................................ 13

*Pickering v. Bd. of Educ.*,
    391 U.S. 563 (1968) ............................................................ 13

*Red Lake Band of Chippewa Indians v. U.S. Dep't of Interior*,
    624 F. Supp. 2d 1 (D.D.C. 2009) ......................................... 8

*Silver v. Am. Safety Indem. Co.*,
    31 F. Supp. 3d 140 (D.D.C. 2014) ....................................... 9

*Sweetland v. Walters*,
    60 F.3d 852 (D.C. Cir. 1995) ............................................... 3

*Triax Pac. v. West*,
    130 F.3d 1469–75 (Fed. Cir. 1997) ..................................... 10

*Trump v. Mazars USA, L.L.P.*,
    140 S. Ct. 2019–35 (2020) .............................................. 2, 15

*United States v. Bolton*,
    No. 1:20-cv-01580, 2020 WL 5866623 (D.D.C. Oct. 1, 2020) ............ 14

*Vanover v. Hantman*,
    77 F. Supp. 2d 91, 98 (D.D.C. 1999), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002) ......... 8

*Weaver v. U.S. Information Agency*,
    87 F.3d 1429 (D.C. Cir. 1996) ............................................. 13

*Wright v. F.B.I.*,
    No. 1:02-cv-915, 2006 WL 2587630 (D.D.C. July 31, 2006) ......... 13, 14

**Statutes & Rules of Procedure**

3 U.S.C. § 105 ........................................................................ 3

18 U.S.C. § 3506 ................................................................. 2, 4

Fed. R. Civ. P. 12 ................................................................. 8

**Other Authorities**

Megan M. McLaughlin, *The Unofficial Federal Officer*,
   46 HASTINGS CONST. L.Q. 17, 19 (2018) ................................................................................. 3

## **INTRODUCTION**

The United States brought this action to vindicate interests that are fundamental to preserving the functioning of the Executive Branch of government.  The First Lady assists the President of the United States in performing his duties as head of the Executive Branch and head of State, including by advancing her own policy initiatives and leading various ceremonial functions.  Both require the aid of assistants to accomplish their duties, which overlap with their personal lives.  It is essential that those assistants protect sensitive information that must be entrusted to them for them to provide candid advice and accomplish sensitive tasks.  Ms. Wolkoff volunteered to be such an assistant to the First Lady and signed an agreement that was primarily designed to ensure that she would keep confidential all information entrusted to her as part of her service.  That agreement provided no stopping point for such confidence; if it ended as soon as she ended her service, that would largely defeat the point.  Ms. Wolkoff had open access to significant confidential information related to the First Lady's official duties, as well as to more private aspects of her role in the First Family, along with indirect access to deliberative information that was related to the President's official duties on behalf of the country.  After leaving her position under what she believed to be unfair circumstances, Ms. Wolkoff retaliated by publishing a tell-all book containing this highly confidential information.  She refused to clear the publication of this information with the White House, even after being reminded of her obligations under her agreement.  This breach of trust undermines the confidence necessary for the First Lady, and the President, to perform their duties.  Ms. Wolkoff must accordingly not be allowed to profit off this breach.

Ms. Wolkoff has moved to dismiss the complaint, which seeks to hold her to her obligations, by arguing that the contractual provisions do not continue to bind her, that there was no contract, and that the contract violates her First Amendment rights.  But there is nothing

deficient with the contract, which straightforwardly provides that in exchange for Ms. Wolkoff receiving a highly-coveted position of access to the highest levels of government, she would guard the information she obtained continually on behalf of the government to whom it belongs. This requirement is necessary for the Executive Branch to function, and the law recognizes that.

## BACKGROUND

### I.    The First Family's Interest in Confidentiality

The unique role of the President in the constitutional scheme is well established. As the Supreme Court recently emphasized, "[t]he President is the only person who alone composes a branch of government." *Trump v. Mazars USA, L.L.P.*, 140 S. Ct. 2019, 2034–35 (2020). As a result, there is a "close connection between the Office of the President and its occupant," and there is not "always a clear line between his personal and official affairs." *Id.* Moreover, the demands placed on the President under Article II are unceasing, resulting in the intermixing of his official life, including both the exercise of Executive Branch and ceremonial functions, with his personal life. *See Clinton v. Jones*, 520 U.S. 681, 697 (1997) (The President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties."); *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 496–97 (2010) (reaffirming "the basic principle that the President 'cannot delegate ultimate responsibility or the active obligation to supervise that goes with it,' because Article II 'makes a single President responsible for the actions of the Executive Branch.'" (quoting *Clinton*, 520 U.S. at 712–13 (Breyer, J., concurring in judgment))).

At the same time, the President lacks the freedom to carefully compartmentalize his various roles. He is subject to mandatory Secret Service protection at all times, *see* 18 U.S.C. § 3506(a), (b), including review of "his choice of visitors," *Judicial Watch, Inc. v. U.S. Secret Service*, 726 F.3d 208, 224 (D.C. Cir. 2013). He relies on the substantial staff of the Executive Residence to

"assist[] [him] in maintaining his home and carrying out his various ceremonial duties." *Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995). As a consequence, he is necessarily reliant on advisors and assistants, both to assist him in fulfilling his core constitutional responsibilities and to help with the basic responsibilities that a private citizen may be able to accomplish on his own. And because of the intermixing of the President's public and private lives, advisors who assist the President in his public functions may be privy to considerable information about his private life as well.

By virtue of her relationship to the President, the First Lady occupies a similarly unique position. *See generally* Compl. ¶¶ 13–18. While she does not draw a salary, Congress has authorized "[a]ssistance and services . . . to be provided to the spouse of the President in connection with assistance provided by such spouse to the President in the discharge of the President's duties and responsibilities." 3 U.S.C. § 105(e). And as the D.C. Circuit has recognized, the First Lady "acts as the functional equivalent of an assistant to the President." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 904 (D.C. Cir. 1993); *see also id.* at 905 (recognizing "[t]he President's implicit authority to enlist his spouse in aid of the discharge of his federal duties"); *Hall v. Clinton*, 285 F.3d 75, 80 n.4 (D.C. Cir. 2002) (First Lady has a "quasi-official role in White House affairs"). Beyond simply assisting the President with discharging his official duties and responsibilities and serving as his confidante, the First Lady has also historically performed separate, complementary roles, including hosting foreign dignitary visits to the White House, planning official events, pursuing initiatives to address domestic issues of public concern, giving speeches, and supervising renovations and improvements to the White House and its surrounding grounds (all of which is federal property maintained by the National Park Service). *See* Compl. §§ 15–16 (citing Megan M. McLaughlin, *The Unofficial Federal Officer*, 46 HASTINGS

CONST. L.Q. 17, 19 (2018)).

The First Lady, like the President, is thus dependent on aides to assist her in fulfilling the traditional public role she serves on behalf of the President and the Government.  Compl. ¶ 18. Also like the President, the First Lady is entitled to Secret Service protection, which means she, too, must rely on assistants to perform private functions that most people perform on their own. *See* 18 U.S.C. § 3506(a).

At the same time, members of the First Family remain entitled to privacy in their personal lives.  Courts have repeatedly "recognized that although public officials 'may have a somewhat diminished privacy interest,' they 'do not surrender all rights to personal privacy when they accept a public appointment.'"  *Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 876 F.3d 346, 349 (D.C. Cir. 2017) (quoting *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1092 (D.C. Cir. 2014)).  That is certainly no less true of the First Lady than of other public officials.  *See id.* at 349–50 (finding that privacy concerns justified withholding of draft indictment against Hillary Clinton under FOIA Exemption 7(C), notwithstanding argument that her public positions as First Lady and Senator created a public interest that outweighed those concerns).  By the same token, private information about the President and the First Family does not automatically become a matter of public concern, even if the general public might want to know the information.  *See Haddon v. Exec. Residence at White House*, 313 F.3d 1352, 1360–61 (Fed. Cir. 2002) (explaining that not every "private detail concerning the First Family could be turned into a matter of public concern").

Accordingly, the First Lady, as much as the President, needs to be able to hire and rely upon assistants who will invariably acquire sensitive governmental information (including potentially privileged information and information that could affect national and international

affairs) and sensitive personal information about the First Family.  Indeed, the need for trust is all the more pressing given that every such bit of sensitive information, from nascent policymaking to highly intrusive personal details, will inevitably be of interest to the press and the president's political opponents.  It is thus particularly important that the First Lady be able to perform her various roles without fear that those providing assistance to her and to other members of the First Family—and, indirectly through them, to the President—will divulge information provided in confidence that, if divulged, could undermine those critical presidential functions.  Compl. ¶ 18. The traditional role of the First Lady in connection with the President and the federal government would be impaired if a confidential advisor could wholly ignore her voluntarily undertaken nondisclosure obligations.  *Id.*

II.    **Ms. Wolkoff Agrees to Serve the First Lady In An Advisory Role**

Following President Trump's election on November 8, 2016, Mrs. Trump began planning her transition to the White House.  Compl. ¶ 19.  In January 2017, Ms. Wolkoff volunteered to assist Mrs. Trump as an advisor.  *Id.*  Between January 2017 and August 21, 2017, Ms. Wolkoff served as an advisor to the First Lady.  *Id.*  She assisted the First Lady in making personnel decisions for the First Lady's staff, helped to supervise the remodeling of spaces in the East Wing of the White House for the First Lady and the Office of the First Lady, and communicated with the press on behalf of the First Lady.  *Id.*

On August 21, 2017, Ms. Wolkoff entered into a "Gratuitous Services Agreement" with the Government formally memorializing the terms of her service to the First Lady.  Compl. ¶ 20; *see also* Gratuitous Services Agreement ("Agreement"), ECF No. 1-1.  The Agreement was approved by a government contracting officer on August 22, 2017.  Compl. ¶ 20; Agreement at 5. Under the Agreement, Ms. Wolkoff agreed to serve in a "volunteer role as a trusted advisor to Mrs.

Melania Trump, the First Lady of the United States (FLOTUS)."  Agreement at 1 (introduction). In her capacity as an "advisor," Ms. Wolkoff agreed to "provid[e] advice and guidance on initiatives for FLOTUS as set forth" within the Agreement.  *Id.*  For example, the First Lady would rely on Ms. Wolkoff to provide "advice with regard to policy initiatives, speeches to be given by FLOTUS and FLOTUS'[s] social media presence."  *Id.* § I.

Some of the terms of the Agreement are limited to the period "[b]etween the execution of this Agreement and September 30, 2018," such as Section I, concerning such issues as compensation and employment status.  *Id.*  Other provisions of the Agreement are not so limited. *See, e.g., id.* § VII ("I shall not disclose the contents of this Agreement, *or my work with FLOTUS and OFL* [Office of the First Lady], to any person or entity to whom disclosure has not been authorized in writing by FLOTUS, the Chief of Staff to the First Lady or the Office of White House Counsel." (emphasis added)).

Ms. Wolkoff expressly "recognize[d] the importance and sensitivity" of her role and therefore "acknowledge[d] and agree[d]" to various obligations as a condition of taking on this role.  *Id.* at 1.  In particular, the Agreement makes clear that, by virtue of being placed in a position of trust as an advisor, Ms. Wolkoff "may have access to nonpublic, privileged and/or confidential information" while serving the First Lady.  *Id.* § V.  Because of the trust placed in Ms. Wolkoff by the First Lady, and in consideration for access to the White House and sensitive information, *id.* §§ X, XIII, Ms. Wolkoff agreed to maintain strict confidentiality regarding this information. She agreed, among other things, to "protect from inadvertent or intentional release or unauthorized disclosure any and all information furnished to [her] by the Government under this Agreement, information about the First Family, or other information about which [she] may become aware during the course of performance."  *Id.* § V.  She also agreed that, "while this information is in

[her] possession, [she would] take all reasonable measures to protect it from unauthorized disclosure." *Id.* She further acknowledged that she was "specifically prohibited from publishing, reproducing, or otherwise divulging any such information to any unauthorized person or entity in whole or in part." *Id.*

Ms. Wolkoff further agreed that she would not "use or reference [her] gratuitous services in connection with any merchandising or other commercial activity," and that she would "not issue or publish any publicity materials or statements, including those made through the press or social media, about [her] gratuitous service to FLOTUS without express authorization from [the Office of the First Lady]." *Id.* § XI. She also committed to "clear all materials and statements with the First Lady's Chief of Staff and FLOTUS prior to public dissemination." *Id.*

### III.    Ms. Wolkoff's Conduct After Leaving the White House

Ms. Wolkoff has indicated that her obligation to perform services for the First Lady under the Agreement ended on February 20, 2018. Compl. ¶ 31. On September 1, 2020, Simon & Schuster released a book, titled *Melania and Me* and authored by Ms. Wolkoff, to the public. *Id.* ¶ 34. At no point did Ms. Wolkoff seek, nor has she received, permission from the First Lady, the Office of the First Lady, the Chief of Staff to the First Lady, the Office of White House Counsel, or any other office within the Executive Office of the President, to publish *Melania and Me*. *Id.* ¶ 35. As detailed in the complaint, *Melania and Me* contains a detailed accounting of Ms. Wolkoff's work with the First Lady, including non-public, privileged, or confidential information that Ms. Wolkoff obtained during the course of performing the role specified in the Agreement. *Id.* ¶ 37. The book discloses, for example, information relevant to the President's deliberations on policy and personnel matters, *id.* ¶¶ 39–40, 42; verbatim copies of communications between Ms. Wolkoff, the First Lady, and other White House staff, *id.* ¶ 41; and deliberations with the First

Lady about her public initiatives and activities, *id.* ¶¶ 43–45.

Despite being made aware of her obligations under the Agreement months before the book was published, Ms. Wolkoff chose to press ahead with publication of her book without first submitting a manuscript for written approval by FLOTUS, the Chief of Staff to the First Lady or the Office of White House Counsel.  *Id.* ¶¶ 33–36.  This lawsuit followed.

## LEGAL STANDARD

Dismissal under Fed. R. Civ. P. 12(b)(6) is appropriate only when, assuming the truth of all well-pleaded factual allegations, the complaint fails to state a claim upon which relief can be granted.  To pass muster, a complaint must contain "sufficient factual matter" to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court must accept well-pleaded factual allegations as true and construe them in the light most favorable to the plaintiff.  *Id.*  And "[w]here a document is referred to in the complaint and is central to plaintiff's claim"—like Ms. Wolkoff's book—"such a document attached to the motion papers may be considered without converting the motion to one for summary judgment."  *Franklin v. Capitol Hilton Hotel*, 325 F. Supp. 3d 25, 29 (D.D.C. 2018) (Kollar-Kotelly, J.) (quoting *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002)).

Courts must apply "the federal common law of contracts to the interpretation of contracts with the federal government."  *Red Lake Band of Chippewa Indians v. U.S. Dep't of Interior*, 624 F. Supp. 2d 1, 12 (D.D.C. 2009).  The federal common law of contracts largely "dovetails" with "general principles of contract law."  *NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 681 (D.C. Cir. 1985).

## ARGUMENT

## I.     The Confidentiality Provisions in the Agreement Survived Its Termination

Ms. Wolkoff argues that "the Agreement did not provide for the confidentiality provisions

to survive termination of the Agreement." ECF No. 16–1 ("Def. Mem.") at 4. Ms. Wolkoff is wrong.

"The first step in contract interpretation is determining what a reasonable person in the position of the parties would have thought the disputed language meant. . . . The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms," and "[i]f a document is facially unambiguous, its language should be relied upon as providing the best objective manifestation of the parties' intent." *Silver v. Am. Safety Indem. Co.*, 31 F. Supp. 3d 140, 146 (D.D.C. 2014) (quoting *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 (D.C. 1984)). If the contract is ambiguous, the court may resort to extrinsic evidence of the parties' subjective intent. *Id.*

A reasonable person in Ms. Wolkoff's position, entering into this Agreement, would have understood that the Agreement's confidentiality provisions survived its termination. Ms. Wolkoff agreed to "protect from inadvertent or intentional release or unauthorized disclosure any and all information furnished to [her] by the Government under this Agreement, information about the First Family, or other information about which [she might] become aware during the course of performance." Agreement § V. And the Agreement expressly stated the time during which Ms. Wolkoff agreed to "take all reasonable measures to protect [such information] from unauthorized disclosure"—namely, she agreed to do so "*while this information is in [her] possession.*" *Id.* § V (emphasis added). Thus, unlike the confidentiality clauses found in the cases cited by Ms. Wolkoff,[1] the provisions at issue here include a temporal condition: They apply so long as Ms.

---

[1]    *See Howard Town Ctr. Dev., L.L.C. v. Howard Univ.*, 7 F. Supp. 3d 64, 87 n.18 (D.D.C. 2013) ("'each Party shall maintain as confidential and shall not publicly disclose the terms of this Agreement without the advance written consent of the other Party' and '[a]ny press release or other public statement that either party proposes to issue shall be subject to the prior review and approval by each Party, such approval not to be unreasonably withheld'"); *All W. Pet Supply Co. v. Hill's*

Wolkoff is in "possession" of the protected information.  *Id.*

Ms. Wolkoff suggests as a fallback position that any ambiguity in the Agreement should be construed against the Government.  Def. Mem. at 6.  As an initial matter, however, there is no meaningful ambiguity about the term of the confidentiality obligations given the express statement that they apply "while [the relevant] information is in [Ms. Wolkoff's] possession."  Agreement § V.  But even if that language were patently and glaringly ambiguous, federal common law establishes that such ambiguity is not to be construed against the Government; it is to be construed against Ms. Wolkoff, as the Government's counterparty.  *Triax Pac. v. West*, 130 F.3d 1469, 1474–75 (Fed. Cir. 1997) ("The existence of a patent ambiguity in a government contract raises the duty of inquiry, regardless of the reasonableness of the contractor's interpretation.  That duty requires the contractor to inquire of the contracting officer as to the true meaning of the contract before submitting a bid.  Absent such inquiry, a patent ambiguity in the contract will be resolved against the contractor." (internal citations and quotations omitted)).

Even if any such ambiguity could be considered latent rather than patent in nature—which is to say, even if it is more subtle and did not create a duty for Ms. Wolkoff to inquire about the meaning—it still cannot automatically be construed against the Government.  "[T]he general rule of *contra proferentem* against the drafter of ambiguity" only applies against the Government where, among other things, "'the contract specifications were drawn *by the Government*.'"  *HPI/GSA 3C, L.L.C. v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004) (emphasis added).  But the Agreement was not unilaterally written by the Government.  Indeed, Ms. Wolkoff was represented

_____

*Pet Prods. Div., Colgate-Palmolive Co.*, 840 F. Supp. 1433, 1437 (D. Kan. 1993) ("Under the terms of the agreement describing the obligations of Hill's, '[r]etail sales agreement describing the obligations of Hill's [r]etail sales management system information provided to Hill's . . . shall be held in strictest confidence and shall not be discussed with, or provided to, any other distributor regardless of their relationship to Hill's.'").

by two sophisticated law firms—Jones Day and Steptoe & Johnson—and wrote that that the Agreement was "drawn up" by her "former lawyers," and that the contractual negotiations between her law firms and the Government "took *forever*."  Ex. A, *Melania and Me* 254, 305 (emphasis in original).  As a result, any latent ambiguity in the Agreement's confidentiality provisions should be construed *against* Ms. Wolkoff.  *See* Def. Mem. at 6 (arguing that ambiguity should be construed against "the Agreement's drafter").

In sum, the Agreement's plain language demonstrates that its confidentiality provisions survived its termination.  And even assuming that those provisions are ambiguous (and they are not), any ambiguity—whether patent or latent—must be construed against Ms. Wolkoff.

## II.    The Agreement Is Not Void for Lack of Consideration

Ms. Wolkoff also argues that she received no consideration for her services.  Def. Mem. at 7.  This contention is not remotely plausible.

The Agreement expressly provided that Ms. Wolkoff would "be[] allowed access to The White House complex and equipment in connection with the Agreement" as well as "White House communications and email systems."  Agreement §§ X, XIII.  And Ms. Wolkoff made clear in her book that she "absolutely considered it a privilege to work in the White House."  Ex. A, *Melania and Me* 176.  Indeed, as the complaint itself recognizes, "[f]ew individuals are permitted such access and for someone in Ms. Wolkoff's position (a former director of special events at Vogue and producer of Met Galas), the ability to see firsthand the protocols and operations of the White House was a tremendous personal and professional opportunity of great value."  Compl. ¶ 24.[2]

---

[2]    Ms. Wolkoff argues that this allegation "is inconsistent with the plain language of the Agreement."  Def. Mem. at 8.  It is difficult to discern how access to the White House, and to those who live and work within its walls, would be inconsistent with "personal and professional opportunity."  Compl. ¶ 24.

And Ms. Wolkoff admitted, albeit grudgingly, that the Agreement afforded her the "privilege of working . . . for free." Ex. A, *Melania and Me* 255 (emphasis added). As she explained: "It was absurd. And yet I'd *fought* to make this happen. I was thrilled it was finally done." *Id.* If Ms. Wolkoff in truth received no consideration as part of the Agreement, why would she have "fought" for it? And why would she have been "thrilled" upon its execution?

The answer, of course, is that the Agreement allowed Ms. Wolkoff to continue working at the White House—an experience that Ms. Wolkoff may now purport to regret, but one which she admittedly valued at the time. And although Ms. Wolkoff was not paid for her services, this Court has recognized "that continued employment" even as an unpaid *intern* at an advocacy group "may serve as consideration for a new agreement if the employment is at-will." *Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 343 (D.D.C. 2011) (Kollar-Kotelly, J.) ("*CAIR I*"); *see also Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 31 F. Supp. 3d 237, 247 (D.D.C. 2014) (Kollar-Kotelly, J.) ("*CAIR II*") (intern was unpaid). Certainly, Ms. Wolkoff's continued work "as an advisor to the First Lady in the East Wing" of the White House, Compl. ¶ 2, should similarly suffice "as consideration for a new agreement." *CAIR I*, 793 F. Supp. 2d at 343.

Rather than acknowledge that the Agreement—for which Ms. Wolkoff "fought"—was the ticket to her continued work at the White House, Ms. Wolkoff now argues that her White House access was not consideration "for her services," but merely constituted consideration "for her agreement (i) to release the United States from any and all claims . . . and (ii) to protect the security of the 'White House communications and email systems.'" Def. Mem. at 8 (internal citations omitted). But Ms. Wolkoff ignores the forest for the trees. Under federal common law, "[a] contract does not lack mutuality merely because a particular promise or obligation is not offset by

a similar promise or obligation." *Florida Keys Aqueduct Auth. v. United States*, 7 Cl. Ct. 297, 299 (1985), *aff'd*, 790 F.2d 95 (Fed. Cir. 1986) (table). "The pertinent question is whether the agreement *as a whole* is supported by mutual consideration." *Id.* (emphasis added). And here, it was. In exchange for continued White House access, Ms. Wolkoff agreed, among other things, to refrain from disclosing certain information, "while [that] information is in [her] possession." Agreement § V. Ms. Wolkoff violated her end of the bargain and is now liable.

**III.**     <u>**The Agreement Does Not Violate Ms. Wolkoff's Free Speech Rights**</u>

        Finally, Ms. Wolkoff is not correct in asserting that the agreement imposes an unconstitutional restriction on her right to freedom of expression. Agreements such as the one Ms. Wolkoff signed are best understood as contractual waivers of an employee's speech rights. *See Lake James Cmty. Volunteer Fire Dep't, Inc. v. Burke County*, 149 F.3d 277, 280 (4th Cir. 1998) ("[C]ourts have routinely enforced voluntary agreements with the government in which citizens have, for example, given up . . . the right to speak regarding government secrets through confidentiality agreements . . . ."). The relevant question is whether they violate the unconstitutional conditions doctrine. That doctrine establishes that the government "may not deny a benefit" such as public employment "to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). In this context, the doctrine takes the form of the balancing test prescribed by *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), which weighs "the interests of the [employee], as a citizen, in commenting upon matters of public concern" against "the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568; *see also Weaver v. U.S. Information Agency*, 87 F.3d 1429, 1439 (D.C. Cir. 1996) (noting that *Snepp*, which concerned a publication by a former CIA agent, "essentially

applied *Pickering*"); *Wright v. F.B.I.*, No. 1:02-cv-915, 2006 WL 2587630 (D.D.C. July 31, 2006) (applying *Pickering* in analysis of FBI's decision to bar former employee from publishing writings critical of FBI's counter-terrorism efforts).

Although the Government has not asserted that there is *classified* information at issue in this case, *see* Def. Mem. at 9, the cases Ms. Wolkoff relies upon do not preclude the possibility that other weighty governmental interests can justify a requirement that employees provide proposed publications to employers for pre-publication review. Both *McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983), and *United States v. Bolton*, No. 1:20-cv-01580, 2020 WL 5866623 (D.D.C. Oct. 1, 2020), arose specifically from conflicts between the Government and former employees about classified information, and did not address whether any other Government interests could justify a pre-publication review requirement. Here, the Government's interest in ensuring that those who serve as advisors to the First Lady safeguard sensitive, confidential, or non-public information—ranging from information protected by Executive privilege to private information concerning the First Lady's relationship with her husband, the President—is more than sufficient to justify the requirement of submitting works for review prior to publication. *Cf. Wright*, 2006 WL 2587630, at *9 ("[T]he Government may still have a legitimate interest in censoring unclassified information."); *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 383 (7th Cir. 2009) (upholding county's policy of requiring employees of the sheriff's office to obtain authorization from the sheriff or his designee to disclose "official agency business" before doing so).

It is facile to assert, as Ms. Wolkoff does, that there is no governmental interest at stake here because the First Lady is not formally a government official. Def. Mem. at 10. Indeed, this argument is belied by Ms. Wolkoff's acknowledgement that the First Lady's activities are "matters

of public concern." *Id.* The fact that the First Lady's activities are matters of public concern is largely a consequence of the First Lady's close relationship to the head of the Executive Branch. There is not "always a clear line between [the President's] personal and official affairs," *Mazars*, 140 S. Ct. at 2034–35, and this reality must be considered when evaluating the interests of the First Family. Because of the First Lady's status as a de facto advisor to the President, the First Family's reasonable expectation of privacy, and the necessary intermixing of the First Family's public and private lives, it is appropriate for the Court to treat the First Lady as the "functional equivalent of an assistant to the President" in terms of status as a government official. *Ass'n of Am. Physicians & Surgeons*, 997 F.2d at 904.

Ms. Wolkoff is also incorrect to suggest that the restriction here is not "narrowly drawn" to serve the Government's interest in protecting the legitimate confidentiality and privacy interests of the First Family. Pl. Mem. at 10–11. The snippets of the Agreement Ms. Wolkoff relies upon ignore the full context of the paragraph, which makes it clear that the restriction is limited to "nonpublic, privileged and/or confidential information."[3] Agreement § V; *see also* Compl. ¶ 37 (alleging *Melania and Me* contains "non-public, privileged, or confidential information that Ms. Wolkoff obtained during the course of performing the role specified in the agreement"). That

---

[3] The full provision reads, in relevant part:

> I understand that I may have access to nonpublic, privileged and/or confidential information in the course of performing my gratuitous services. I hereby agree that I will protect from inadvertent or intentional release or unauthorized disclosure any and all information furnished to me by the Government under this Agreement, information about the First Family, or other information about which I may become aware during the course of performance. I acknowledge that I am specifically prohibited from publishing, reproducing or otherwise divulging any such information to any unauthorized person or entity in whole or in part. . . .

Agreement § V.

focus is also evident from the context of the Agreement as a whole, which was entered to formalize Ms. Wolkoff's "import[ant] and sensitiv[e] . . . . role as a trust advisor" to the First Lady. Agreement at 1.

## **CONCLUSION**

For these reasons, the Court should deny Ms. Wolkoff's motion to dismiss.

Dated:  January 18, 2021

Respectfully submitted,

JOHN V. COGHLAN
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director
Federal Programs Branch

*/s/   Jeffrey A. Hall*
JEFFREY A. HALL (DC 1019264)
Attorney
United States Department of Justice
Civil Division
950 Pennsylvania Ave. NW, Room 3614
Washington, D.C. 20530
Tel: (202) 353-8679
Fax: (202) 616-8460
E-mail: jeffrey.a.hall@usdoj.gov

*Attorneys for Plaintiff*